# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **KENNETH THOMAS,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | **CIVIL ACTION NO.** |
| ] | **1:17-CV-01258-KOB** |
| **IMERYS CARBONATES, LLC,** ] | |
| ] | |
| **Defendant.** ] | |

## <u>MEMORANDUM OPINION</u>

In this disability discrimination case, two employees, one with diabetes and one without, refused the same instructions, yet only the diabetic employee suffered punishment for insubordination. A jury—not the court on a motion for summary judgment—must answer whether discrimination played a part.

This matter comes before the court on Defendant Imerys Carbonates's motion for summary judgment. (Doc. 39). In the motion, Imerys asks the court to enter summary judgment in its favor on Plaintiff Kenneth Thomas's ADA disability discrimination and retaliation claims because, according to Imerys, no genuine dispute exists that it terminated Mr. Thomas for insubordination, not because of Mr. Thomas's diabetes, and not in retaliation for Mr. Thomas requesting a reasonable accommodation for his diabetes.

The court will DENY the motion for summary judgment because, as

1

explained below, several genuine disputes of material fact exist as to both Mr. Thomas's disability discrimination and retaliation claims. Most notably, evidence that Imerys did not scrutinize an employee without a disability who engaged in the same conduct that led to Mr. Thomas's termination, and evidence that Mr. Thomas may not have been insubordinate or was insubordinate only to request an accommodation, creates a genuine question of the true reason for Mr. Thomas's termination.

## I.    STANDARD OF REVIEW

A trial court can resolve a case on summary judgment *only* when the moving party establishes two essential elements: (1) no genuine disputes of material fact exist; *and* (2) the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Under the first element of the moving party's summary judgment burden, "'[g]enuine disputes [of material fact] are those in which the evidence is such that a reasonable jury *could* return a verdict for the non-movant.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (emphasis added) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). And when considering whether any genuine disputes of material fact exist, the court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v.*

*Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

Pursuant to these rules, the court next presents the facts in the record in the light most favorable to Mr. Thomas.

## II. BACKGROUND

### A. Mr. Thomas's Employment and Diabetes

Mr. Thomas worked as a bulk bag operator in the packaging and shipping department at Imerys's carbonate mines in Sylacauga, Alabama for 18 years until his termination on September 18, 2014. (Doc. 52-1 at 6). As a bulk bag operator, Mr. Thomas used a machine to fill bags with finished products and used a forklift to transfer the bags to a storage area.

In February 2012, Mr. Thomas visited his physician for high blood pressure, weakness, poor balance, dizziness, significant weight loss, increased thirst, and frequent urination. The physician diagnosed him with diabetes. (Doc. 52-1 at 14-15).

Mr. Thomas manages his diabetes by maintaining a strict diet, exercising regularly, checking his blood sugar level twice a day, and taking Metformin daily to stabilize his blood sugar. If his blood sugar is low, or if he feels jittery and weak, Mr. Thomas will eat a snack to raise his blood sugar to a normal level. (Doc. 52-1 at 15-16, 18, 20).

Mr. Thomas took off work for a week after receiving his diagnosis. When

he returned to work, he showed his doctor's excuse to his supervisor, Wayne Whitley, and the packaging and shipping department manager, Jack Holley, and told the two men that he was diabetic. Mr. Whitley and Mr. Holley told Mr. Thomas that if he was not feeling well he could "just go and do what you need to do." (Doc. 52-1 at 18). Mr. Thomas had scheduled breaks at 9:00 a.m. and 12:00 p.m., but if he felt bad or needed to check his blood sugar in between breaks, he could shut his machine down and go get a snack, check his blood sugar, or take his medicine. (*Id.*). Mr. Thomas only had to say "I need to eat" to let his supervisor know that he was having a diabetic episode and go eat. (Doc. 49-2 at ¶ 3).

### B. The September 12, 2014 Sweeper Inspection Incident

On September 12, 2014, officials from the Mine Safety and Health Administration (MSHA) visited Imerys's plant to perform an inspection. Mr. Thomas had previously experienced an MSHA inspection at Imerys's plant and understood that Imerys employees had to assist MSHA inspectors as a priority. (Doc. 52-1 at 26-27).

That morning, the packaging and shipping crew consisted of Mr. Thomas, Marcus McGhee, Marcellus Jackson, Eric Dark, and Woodrow McKenzie. (Doc. 52-1 at 26). As usual, Mr. Whitley supervised the crew that day, but Terry Ingram served as the "Lead Man." (*Id.*). As Lead Man, Mr. Ingram coordinated MSHA inspectors' access to equipment they wanted to inspect. (Doc. 53-1 at 19, 28).

Mr. Whitley told Mr. Ingram that an MSHA inspector wanted to inspect each crew member's forklift.  (Doc. 53-1 at 19-20).  So Mr. Ingram told the crew, "you got to get your forklift inspected."  (*Id.* at 21).  The crew did not have a firm time limit for the inspection, but Mr. Ingram testified that "you ain't going to leave the MSHA inspector out there no 30 to 40 minutes," that his men "know what to do" when informed of an inspection, and that "[w]hen the man comes and says you need the forklift inspected, do what the man said."  (*Id.*).  Each crew member, including Mr. Thomas, then drove his forklift up for inspection at the "first free moment."  (Doc. 52-1 at 27; Doc. 53-1 at 21).

The MSHA inspector also wanted to inspect the crew's sweeper.  Like a forklift, a sweeper is a drivable piece of heavy equipment.  (Doc. 53-1 at 9).

Around the crew's scheduled 9:00 a.m. break, Mr. Ingram asked Mr. McGhee to drive the sweeper to the MSHA inspector.  Mr. McGhee declined.  At his deposition, Mr. McGhee testified that Mr. Ingram knew that he could not drive the sweeper because he has a disability involving his left eye, and he cannot see his surroundings when driving the sweeper because it does not have mirrors.  (Doc. 53-2 at 13-14).

Mr. Ingram then asked Mr. Jackson, who does not have a disability, to drive the sweeper to the MSHA inspector.  Mr. Jackson responded "no."  (Doc. 54-1 at 9, 13).  At his deposition, Mr. Jackson testified that he "was just messing with" Mr.

Ingram and would have moved the sweeper if Mr. Ingram asked him again.  (Doc. 54-1 at 13).

Mr. Ingram then approached Mr. Thomas as he entered the break room for the scheduled 9:00 a.m. break.  Mr. Ingram told Mr. Thomas to take the sweeper to the MSHA inspector.  Mr. Thomas said, "I need[] to eat something.  I need[] to get something to eat."  (Doc. 52-1 at 30).  Mr. Ingram responded, "[y]ou're not going to take your break until you take that sweeper off."  (*Id.*).  Mr. Thomas responded, "[m]an, I need to eat me something, I really need to eat something," and walked into the break room.  (*Id.*).  At his deposition, Mr. Thomas testified that he planned to drive the sweeper to the inspector after he ate a snack to raise his blood sugar level.  (*Id.*).

Mr. Ingram immediately reported Mr. Thomas's refusal to Mr. Whitley.  Mr. Whitley then went into the break room and asked Mr. Thomas to take the sweeper to the inspector.  Mr. Thomas said, "I need to eat something then I'll take it out."  (Doc. 52-1 at 156).  Mr. Whitley said, "no you're going to do it now."  (*Id.*).  Mr. Thomas said, "can't you let your [Lead Man] do it?  I'm sure MSHA will wait until after I take my break. . . .  I'm asking you to let me eat my food."  (*Id.*).  Mr. Whitley then told Mr. Thomas to clock out and go home.  (Doc. 52-3 at 32).  Mr. Jackson eventually moved the sweeper.

## C.    Investigation and Termination

The same day, September 12, 2014, Mr. Whitley reported the incident to Mr. Holley and the human resources specialist, Anessa Osborn, who investigated the incident.

Ms. Osborn interviewed Mr. Jackson on September 15, 2014. Mr. Jackson informed Ms. Osborn that Mr. Ingram first asked him to move the sweeper before Mr. Ingram asked Mr. Thomas, and that Mr. Thomas said he would move the sweeper after he finished eating. (Doc. 54-6 at 8).

Then, on September 16, 2014, Ms. Osborn interviewed Mr. Thomas. Mr. Thomas informed Ms. Osborn that he told Mr. Whitley that he would move the sweeper after he finished eating. (Doc. 54-6 at 6).

After taking Mr. Thomas's statement, Ms. Osborn spoke with Mr. Holley, the operations manager, Stuart Hoxsey, and the human resources director, Mark Vincent, to review the information that she gathered from the interviews and discuss how they should proceed. (Doc. 52-6 at 22-24). Ms. Osborn recommended that Imerys terminate Mr. Thomas's employment for insubordination. (*Id.* at 25). The Imerys employee handbook listed "Insubordination (such as failure to follow a supervisor's reasonable instructions)" as a punishable offense. (Doc. 54-2 at 13).

At her deposition, Ms. Osborn testified as to her reasons for recommending

termination:

> I felt like he was being insubordinate. I felt like that he had had ample opportunity to explain to his supervisor why he wouldn't do what he asked him to do.
>
> He had -- based on his own statement, he had originally indicated that he didn't tell him because he didn't want other people to know. But when I met with him he admitted when [Mr. Whitley] first came in and asked him that nobody else was present.
>
> So I felt like that, as a diabetic, if you are not feeling well, there's no reason why you shouldn't say so.
>
> He said in his statement to me that he was feeling jittery. However, at no point did he say that to his supervisor.

(Doc. 52-6 at 25).

Mr. Hoxsey, Mr. Holley, and Mr. Vincent agreed with Ms. Osborn's recommendation. So, on September 18, 2014, Imerys terminated Mr. Thomas. (Doc. 52-1 at 158). Imerys provided Mr. Thomas a termination notice that stated Imerys terminated him for insubordination because he "made no effort to comply with his supervisor's instruction" to take the sweeper out for inspection. (*Id.*).

### D.    Procedural History

On March 10, 2015, Mr. Thomas filed an EEOC charge against Imerys alleging disability discrimination and retaliation for his termination. (Doc. 1-1). On May 2, 2017, the EEOC sent Mr. Thomas his Notice of Right to Sue, informing Mr. Thomas that he could file suit within 90 days of receipt of the Notice. (Doc. 1-3). Mr. Thomas timely filed his complaint in the court on July 27, 2017. (Doc. 1).

Mr. Thomas brings two counts in his complaint: (1) disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*; and (2) retaliation in violation of the ADA.

Mr. Thomas's first claim—disability discrimination—rests on two theories: (1) that Imerys terminated him because he had diabetes; and (2) that Imerys failed to reasonably accommodate his diabetes by not letting him eat a snack on September 12, 2014 before taking the sweeper for inspection. And Mr. Thomas's second claim—retaliation—rests on his contention that Imerys terminated him because he requested the reasonable accommodation of eating a snack before taking the sweeper for inspection.

The evidence discussed above, viewed in the light most favorable to Mr. Thomas, reveals several genuine disputes of material fact. First, a genuine dispute exists as to whether Mr. Thomas's diabetes is a disability as defined by the ADA. Second, a genuine dispute exists as to whether Imerys terminated him because of his diabetes, because Imerys did not punish Mr. Jackson, who does not have a disability, for refusing to move the sweeper. Third, a genuine dispute exists as to whether Mr. Thomas requested a reasonable accommodation when he asked to eat a snack before taking the sweeper for inspection. Fourth, a genuine dispute exists as to whether Imerys denied Mr. Thomas the opportunity to eat a snack. And finally, a genuine dispute exists as to a causal link between Mr. Thomas's request

to eat and his termination.

Because of these genuine disputes of material fact, and as the court further explains below, the court will DENY Imerys's motion for summary judgment.

## III. ANALYSIS

### A. Disability Discrimination - Disparate Treatment

Mr. Thomas bases his ADA disability discrimination claim first on disparate treatment; he contends that Imerys terminated him because of his diabetes when it did not punish a similarly situated non-disabled employee for the same conduct.

The burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) for Title VII disparate treatment claims applies to ADA disparate treatment claims. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). Under this framework, a plaintiff first must establish a prima facie case of disparate treatment. A plaintiff succeeds at this step by showing that (1) he had a disability; (2) he was qualified to perform the essential functions of his job, either with or without reasonable accommodation; *and* (3) he was subjected to an adverse employment action because of his disability. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse

employment action. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). The defendant's burden is light; the defendant must only produce a reason, not persuade the court that the reason was the defendant's actual reason for the adverse employment action. *Id.* at 1242-43.

Once the defendant carries its minimal burden, the plaintiff must raise a genuine issue that the defendant's "proffered reason really is a pretext for unlawful discrimination" to survive a motion for summary judgment. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) (internal quotation marks and citations omitted). The plaintiff can show a genuine issue of pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (citation and internal quotation marks omitted). And the plaintiff can rely on circumstantial evidence to show pretext, so long as the evidence "raises a reasonable inference that the employer discriminated against the plaintiff." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Further, the circumstantial evidence of pretext "may include . . . the same evidence offered initially to establish the prima facie case." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004).

The court next proceeds through the shifting burdens of Mr. Thomas's

disparate treatment claim.

1.    *Prima facie case*

Turning to the first element of Mr. Thomas's prima facie case, the court must determine if a genuine dispute exists as to the threshold issue of whether Mr. Thomas has a disability.  The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1)(A).  The court must disregard "ameliorative effects of mitigating measures" when determining whether an impairment substantially limits a major life activity.  42 U.S.C. § 12102(4)(E)(i).  "Mitigating measures" include medication and reasonable accommodations.  42 U.S.C. § 12102(4)(E)(i)(I), (III).  And "major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

Here, Mr. Thomas's disability—diabetes—is not a *per se* disability under the ADA, but Mr. Thomas has provided enough evidence to submit to a jury the question of whether his diabetes substantially limits his major life activities.  Mr. Thomas was diagnosed with diabetes in February 2012 after suffering from weakness, poor balance, dizziness, markedly increased thirst, and frequent urination.  He becomes jittery and weak when his blood sugar drops because of his

diabetes and he could faint if his blood sugar does not stabilize. Reasonable jurors could determine that these serious impairments limit Mr. Thomas's ability to perform major life activities, especially his ability to perform his job that requires him to operate heavy machinery. Although he manages his diabetes with medication, blood sugar monitoring, and eating to stabilize his blood sugar, the court must disregard these mitigating measures as stated above. Accordingly, a genuine dispute exists as to whether Mr. Thomas has a disability under the first prong of his prima facie case.

Next, Imerys does not dispute Mr. Thomas's ability to establish the second element of his prima facie case—that he was qualified to perform the essential functions of his job—nor could they. Mr. Thomas performed his duties for 18 years and continued to perform them after his diabetes diagnosis.

Turning to the third and final element of Mr. Thomas's prima facie case— that he was subjected to an adverse employment action because of his disability— yet another genuine issue of material fact exists. As plaintiffs often proceed at this step, Mr. Thomas points to a similarly situated employee without a disability, Marcellus Jackson, whom Imerys treated more favorably as circumstantial evidence of discrimination. *See Wilson*, 376 F.3d at 1091.

Mr. Ingram asked Mr. Jackson to move the sweeper before he asked Mr. Thomas. Like Mr. Thomas, Mr. Jackson was a packaging and shipping crew

member who could drive the sweeper but refused to move the sweeper. So Mr. Jackson's conduct was nearly identical to Mr. Thomas's and Mr. Jackson is a valid comparator. *See Wilson*, 376 F.3d at 1091 ("The plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects. The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.") (citations and internal quotation marks omitted).

But unlike Mr. Thomas, Imerys took no action against Mr. Jackson. After Mr. Jackson refused, Mr. Ingram simply moved on to Mr. Thomas. And Mr. Thomas refused to immediately move the sweeper because of his disability—he stated clearly that he needed to eat, which Mr. Thomas had always done before eating because of his diabetes. (*See* Doc. 49-2 at ¶ 3). Mr. Jackson, on the other hand, simply said "no" and refused to move the sweeper supposedly as a joke. (Doc. 54-1 at 13). But Mr. Ingram persisted with and reported only Mr. Thomas. Mr. Ingram's treatment of Mr. Jackson as compared to Mr. Thomas creates a triable question of discrimination.

Unsurprisingly, Imerys contends that Mr. Jackson is not a comparator and that Mr. Thomas "overlooks a number of inconvenient but undisputed facts which distinguish Jackson's conduct from Plaintiff's." (Doc. 39 at 23-24). Imerys cites specifically to the following undisputed facts: (1) Mr. Jackson did not refuse

multiple requests to move the sweeper; (2) Mr. Jackson refused a request only from a Lead Man and not from Mr. Whitley, his direct supervisor; (3) Mr. Whitley did not know that Mr. Jackson refused Mr. Ingram; and (4) Mr. Jackson eventually moved the sweeper. (Doc. 39 at 24). Imerys correctly calls these facts undisputed, but misinterprets their effect on Mr. Thomas's ability to state a prima facie case.

First, Mr. Jackson did not refuse multiple requests because Mr. Ingram asked him to move the sweeper only once; apparently Mr. Jackson's refusal did not bother Mr. Ingram because he made multiple requests only to Mr. Thomas. Second, Mr. Jackson did not refuse a request from a direct supervisor because Mr. Ingram never reported Mr. Jackson to a supervisor; Mr. Ingram reported only Mr. Thomas. Third, Mr. Whitley did not know of Mr. Jackson's refusal because Mr. Ingram did not tell him; again, Mr. Ingram reported only Mr. Thomas. And fourth, Mr. Jackson eventually moved the sweeper because nobody told him to clock out after refusing to move the sweeper; Mr. Whitley told only Mr. Thomas to clock out. So, these undisputed facts are products of differential treatment for the same conduct and do not challenge Mr. Jackson's validity as a comparator.

Imerys also argues that Mr. Jackson is not a valid comparator to serve as circumstantial evidential of discrimination because Mr. Jackson never refused instructions from a supervisor and, according to the employee handbook, was thus never insubordinate like Mr. Thomas. Imerys points out how Mr. Ingram, the only

15

person who told Mr. Jackson to move the sweeper, was only the Lead Man that day, and according to Imerys, a Lead Man is not a supervisor.  (Doc. 39 at 24).

But as the title "Lead Man" itself suggests, evidence raises a genuine question of a Lead Man's supervisory authority.  Mr. Whitley testified that whether Mr. Jackson should have been disciplined for insubordination for refusing a Lead Man's instruction would depend on the reason for the refusal.  (Doc. 52-3 at 25-26).  Mr. Holley testified that Mr. Jackson should have been disciplined for refusing Mr. Ingram's instruction as Lead Man.  (Doc. 49-1 at 12).  Mr. Ingram himself testified that Mr. Jackson's failure to follow his instructions was insubordination under company policy.  (Doc. 53-1 at 22).  Mr. Ingram also testified that he supervised people as Lead Man the day of the inspection and he was in charge of making sure the inspectors had access to the packaging and shipping crew's forklifts and sweeper.  (*Id.* at 8, 19, 28).  Reasonable jurors could look at this evidence and decide that a Lead Man had supervisory authority over Mr. Jackson and Mr. Thomas, such that both employees could have been equally insubordinate but unequally treated.

With these genuine issues of material fact, Mr. Thomas has satisfied his initial burden of establishing a prima facie case of disparate treatment.

### 2.  *Legitimate non-discriminatory reason and pretext*

The burden now shifts to Imerys to produce a legitimate non-discriminatory

reason for Mr. Thomas's termination. Imerys has carried its burden of production by stating that it terminated Mr. Thomas for insubordination when he refused to move the sweeper before he ate.

So, the burden finally shifts back to Mr. Thomas to show a genuine dispute that Imerys's reason for terminating him—insubordination—is pretext for discrimination. For the following reasons, Mr. Thomas has satisfied this burden.

Mr. Thomas raises a genuine issue of pretext first by showing evidence that casts doubt on whether he was actually insubordinate. The Imerys employee handbook lists "Insubordination (such as, failure to follow a supervisor's *reasonable* instructions)" as a punishable infraction, but evidence suggests that Mr. Whitley's instructions for Mr. Thomas to move the sweeper immediately were not reasonable. (Doc. 54-2 at 13) (emphasis added). Though Mr. Whitley knew that Mr. Thomas had diabetes, he persistently told Mr. Thomas to move the sweeper even though Mr. Thomas said he would move it after he ate. And though the crew had no firm deadline for the sweeper inspection, Mr. Whitley continued to instruct Mr. Thomas as if the inspection was urgent.

Reasonable jurors could find that it is not reasonable to continually instruct a diabetic employee to move heavy machinery when the employee says he first needs to eat and moving it is not an urgent matter. Because a genuine dispute exists as to the reasonableness of Mr. Whitley's instructions, a genuine dispute

exists as to whether Mr. Thomas was insubordinate according to the employee handbook.

In addition, reasonable jurors could find that Mr. Thomas was never insubordinate because evidence shows that he never actually flat-out refused to move the sweeper. Rather, he told Mr. Whitley that he *would* move the sweeper after he ate. (*See* Doc. 52-1 at 156; Doc. 54-6 at 6, 8). Construed in the light most favorable to Mr. Thomas, this evidence shows that Mr. Thomas agreed to follow Mr. Whitley's instructions after a short break, which could discredit Imerys's legitimate non-discriminatory reason.

Finally, the court looks back to "the same evidence offered initially to establish the prima facie case" and finds another genuine issue of pretext. *Wilson*, 376 F.3d at 1088; *see Holland v. Gee*, 677 F.3d 1047, 1057 (11th Cir. 2012) ("[T]o determine whether a jury's ultimate finding of discrimination may be sustained, a court may look back to the evidence related to the prima facie case."). As analyzed above, Mr. Jackson and Mr. Thomas, whom jurors could reasonably conclude are nearly identical except that Mr. Thomas has a disability and Mr. Jackson does not, both declined to move the sweeper. And Mr. Thomas said that he *would* move the sweeper after he ate; Mr. Jackson, on the other hand, simply said "no." Yet, once again, Imerys punished only Mr. Thomas for insubordination.

Mr. Thomas's evidence casting doubt on whether he was insubordinate and

the evidence that he used to establish his prima facie case reasonably disputes that insubordination was the actual reason for his termination. Accordingly, Mr. Thomas has satisfied his burden to show pretext.

Because Mr. Thomas has carried his burden of showing genuine issues of material fact as to his prima facie case and pretext, the court will DENY summary judgment on Mr. Thomas's ADA disability discrimination claim based on disparate treatment.

### B.     Disability Discrimination - Failure to Accommodate

The court turns next to Mr. Thomas's second basis for his disability discrimination claim, that Imerys discriminated against him by failing to reasonably accommodate his diabetes. Like his disparate treatment claim, genuine disputes of material fact protect his failure to accommodate claim from summary judgment.

The *McDonnell Douglas* burden-shifting framework does not apply to an ADA discrimination claim based on a failure to accommodate. *See Holly*, 492 F.3d at 1262. Instead, a plaintiff can survive a motion for summary judgment just by establishing a prima facie case of disability discrimination; that is, that he had a disability, that he was otherwise qualified for the job, and that his employer failed to reasonably accommodate his disability. *See Holly*, 492 F.3d at 1262. The burden does not shift to the employer to articulate a legitimate non-discriminatory

reason, and the plaintiff does not then have to demonstrate pretext, because "an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA . . . ." *Id.*

But an employer's duty under the ADA to reasonably accommodate disabled employees "is not triggered unless a specific demand for an accommodation has been made . . . ." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999). Unsurprisingly, Imerys contends that no genuine issue exists that Mr. Thomas never made a "specific demand" for an accommodation for his disability and thus cannot state a claim for a failure to accommodate. The court disagrees.

Though the Eleventh Circuit has not "determined precisely what form the request [for a reasonable accommodation] must take," *Holly*, 492 F.3d at1261 n.14, it has cited favorably to examples demonstrating that a plaintiff does not have a particularly onerous burden to show that he made a specific demand for an accommodation. *See Holly*, 492 F.3d at 1261 n.14 ("'An employee tells her supervisor, 'I'm having trouble getting to work at my scheduled starting time because of medical treatments I'm undergoing.' This is a request for a reasonable accommodation.'") (citing EEOC Enforcement Guidance, Question 1); *Adigun v. Express Scripts, Inc.*, 742 F. App'x 474, 476 (11th Cir. Aug. 7, 2018) (citing favorably to the Third Circuit, which "has held that a plaintiff making a failure to

accommodate claim must have provided 'enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.'") (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 314 (3d Cir. 1999)).

Here, Mr. Whitley knew that Mr. Thomas had diabetes because when Mr. Thomas returned from his one-week medical absence after receiving his diabetes diagnosis, he provided his doctor's excuse and explained his diagnosis to Mr. Whitley. (Doc. 52-1 at 18). And Mr. Thomas then received accommodations for his diabetes. He "could just shut [his] machine down and go get a snack" if he needed to, an opportunity provided *only* to employees with diabetes. (*Id.*). And his supervisors told him that he could "just go do what [he] need[ed] to do" whenever he needed to manage his diabetes on the job. (*Id.*). So, reasonable jurors could decide that when Mr. Thomas told Mr. Whitley in the break room that he needed to eat, Mr. Thomas specifically demanded the accommodation that he had been given: eating a snack whenever he needed to control his blood sugar.

Imerys contends that even if Mr. Thomas demanded a reasonable accommodation, his claim still fails because Imerys never denied Mr. Thomas the ability to eat a snack. Imerys argues that "on September 12, 2014, Plaintiff was given the opportunity to eat during break and was only asked to delay his break by a few minutes to move the sweeper to the MSHA inspector." (Doc. 39 at 21). But

Imerys misunderstands Mr. Thomas's request—he asked to eat a snack *before* moving the sweeper.  Mr. Whitley denied the request, so genuine issues of material fact exist as to whether Imerys failed to reasonably accommodate Mr. Thomas's diabetes, and the court will DENY summary judgment on his ADA disability discrimination claim based on a failure to accommodate.

### C.    Retaliation

Finally, to address Mr. Thomas's ADA retaliation claim, the court returns to the *McDonnell Douglas* burden-shifting framework that governs ADA retaliation claims based on circumstantial evidence.  *Batson v. Salvation Army*, 897 F.3d 1320, 1328-29 (11th Cir. 2018).  To establish a prima facie retaliation claim, a plaintiff must show "(1) that [he] engaged in statutorily protected conduct, (2) that [he] suffered an adverse employment action, and (3) that a causal connection exists between the two."  *Id.* at 1329 (citing *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006)).

Just as with a disparate treatment claim, if a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the challenged action, and then the burden shifts to the plaintiff to show that the legitimate non-discriminatory reason is pretext.  *Batson*, 897 F.3d at 1329.  Because Mr. Thomas has already shown several genuine issues of whether Imerys's legitimate non-discriminatory reason—insubordination—was

the real reason for his termination, Mr. Thomas's retaliation claim turns on whether he has established a prima facie case.

Under the first element of a prima facie retaliation claim, an employee engages in statutorily protected activity when he requests a reasonable accommodation. *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016). As explained above in the analysis of Mr. Thomas's failure to accommodate claim, genuine issues exist as to whether Mr. Thomas requested the reasonable accommodation of eating a snack before moving the sweeper. So Mr. Thomas has satisfied the first element of his prima facie case.

Mr. Thomas has satisfied the second element of his prima facie case because he suffered an adverse employment action when Imerys terminated him.

Under the third element of Mr. Thomas's prima facie retaliation claim—the causation element—Mr. Thomas's demand to eat before moving the sweeper caused the termination because Imerys considered Mr. Thomas's demand as insubordination, the ultimate reason for his termination. (*See* Doc. 52-1 at 158). And because a genuine dispute exists of whether Mr. Thomas's demand to eat was a request for a reasonable accommodation, a genuine dispute of a causal connection between the request and the termination exists.

But Imerys contends that no causal connection exists because "Ingram and Whitley did not realize that Plaintiff's request to eat on September 12, 2014 was

related to his diabetes." (Doc. 39 at 31). True, Mr. Thomas did not in that moment tell Mr. Ingram and Mr. Whitley that he needed to eat *because* of his diabetes, but evidence shows that he did not need to specify that he needed to eat because of his diabetes. Mr. Thomas testified that after informing Mr. Whitley that he had diabetes, for two years Mr. Thomas only had to say that he needed to eat to request the opportunity to eat, just as he did in the break room on September 12, 2014. (*See* Doc. 49-2 at ¶ 3; Doc. 52-1 at 18).

Further, a plaintiff can show a genuine question of causation "by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Here, Mr. Whitley immediately sent Mr. Thomas home after he requested to eat and Imerys terminated him six days later after an investigation. So, close temporal proximity—and thus more circumstantial evidence of causation—exists.

Genuine disputes exist as to whether Mr. Thomas engaged in statutorily protected activity and whether a causal connection exists between the activity and the termination. And, as explained above, genuine disputes also exist as to whether Imerys's legitimate non-discriminatory reason—insubordination—is pretext. So, Mr. Thomas has once again survived *McDonnell Douglas* burden-shifting and the court will DENY summary judgment on his ADA retaliation

claim.

## IV.    CONCLUSION

Genuine disputes of material fact exist as to Mr. Thomas's ADA disability discrimination claim—for both disparate treatment and failure to accommodate—and his retaliation claim, so, by separate order, the court will **DENY** Imerys's motion for summary judgment.

**DONE** and **ORDERED** this 10th day of December, 2018.

_Karon O. Bowdre_
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE